IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| EMMANUEL S. YANGA, | ) | |
|---|---|---|
| Petitioner, | ) | 4:18CV3009 |
| v. | ) | |
| STATE OF NEBRASKA, DIR. SCOTT FRAKES, and MADSEN, Warden, | ) | MEMORANDUM AND ORDER |
| Respondents. | ) | |

Petitioner has filed an amended petition seeking a writ of habeas corpus (filing no. 13). I now deny the petition and dismiss it with prejudice. No certificate of appealability will be issued. My reasons for doing so are set forth below.[1]

Respondents have filed an answer (filing no. 16), the state court records (filing no. 15), and a brief (filing no. 17). Petitioner has filed a response and brief (filing no. 18, filing no. 19) as well. Mostly, Respondents argue that the claims have been procedurally defaulted without excuse and that if they were not defaulted the claims

---

[1] Petitioner is in prison. He is also serving time for a separate misdemeanor conviction entered in the county court in addition to the conviction in the district court for the felony involved here. The felony conviction, at issue here, occurred on March 4, 2015. I presume that the 60-day sentence in the county court case, imposed on March 9, 2015, must be served after the felony sentence since the county judge made his sentence consecutive to any other sentence and the county judge was aware of the felony conviction that had not yet resulted in the imposition of sentence. The county court case–involving the same victim in this case–is the subject of a separate habeas petition (8:18CV89). I recently denied relief in that case. The two cases required separate petitions because there were separate judgments originating from separate courts–one from the county court and one from the district court. *See* Rule 2(e) of the *Rules Governing Section 2254 Cases in the United States District Courts.*

should be denied because of the deference I am required to give to state court decisions. Petitioner's response and brief makes no (or at least very little) effort to address the procedural default issue and the deference issue.

*Claims*

As I previously ruled, condensed and summarized for clarity, the claims asserted by Petitioner regarding the state felony case in the District Court of Lancaster County, Nebraska (district court #CR14-1382 and appeal to the Nebraska Court of Appeals #A-17-655) are set forth below:

> **Claim One:** Both trial counsel and appellate counsel provided ineffective assistance of counsel under the Sixth Amendment.
>
> **Claim Two:** The prosecutor engaged in prosecutorial misconduct in violation of the Due Process Clause.
>
> **Claim Three:** The trial court abused its discretion in violation of the Due Process Clause.
>
> **Claim Four:** The Petitioner was denied Due Process of law and Equal Protection of the law when the jury was not properly instructed.

(Filing no. 14.)[2]

---

[2] "The Petitioner's third amended petition (filing no. 13) is the one and only operative petition and all prior petitions are dismissed without prejudice. The third amended petition is vague. I am sorry that I cannot focus this case any better, but counsel for the Respondent should respond as best counsel can to the 'supporting facts' portion of each claim. To the extent that Petitioner raises other claims beyond the four set forth above, I deny them because they fail to state cognizable federal claims." (*Id.* at CM/ECF p. 2 n.1.)

*Procedural Background*

1. Yanga was convicted of two counts of attempted second degree assault, one count use of a deadly weapon, one count of criminal mischief over $1500, and one count of third degree assault. The jury returned the verdict on March 4, 2015. (E.g., filing no. 15-6 at CM/ECF p. 139.) At trial, Yanga was represented by Christopher Eickholt. On March 23, 2015, and after trial, Eickholt moved to withdraw. (Filing no. 15-6 at CM/ECF p. 146.) The motion was granted and Douglas Kerns was appointed to represent Petitioner on April 6, 2015. (Filing no. 15-6 at CM/ECF p. 148). Kerns appeared as counsel for Petitioner at sentencing and throughout the direct appeal.

2. Petitioner was sentenced to 20 to 36 months for counts I, II and IV and to 2 to 3 years for Count III, all to be served consecutively, and to 180 days for count V, to be served concurrently with Count IV. (Filing no. 15-6 at CM/ECF pp. 150-152.)

3. On direct appeal, Yanga assigned as error that (a) the jury instructions were either inappropriate or unconstitutionally vague; (b) the district court erred in denying his motion for directed verdict; (c) the district court in failing to dismiss the charges because the state presented inconsistent theories; (d) the district court erred in overruling defense objections and the errors at trial had the cumulative effect of violating his right to a fair trial, and (e) excessive sentences were imposed. (Filing no. 15-4 at CM/ECF p. 5.)

4. Yanga's convictions were affirmed on direct appeal by the Nebraska Court of Appeals in a Memorandum Opinion filed June 14, 2016. (Filing no. 15-4.) The Court of Appeals found that (a) the jury instructions regarding pecuniary loss were appropriate and to the extent that Yanga challenged an underlying statute as unconstitutional the court did not reach the issue because the issue was not properly raised and preserved at trial as required under Nebraska law–in plain terms that portion of the argument was defaulted (filing no. 15-4 at CM/ECF pp. 5-7); (b) the

jury instruction regarding expert testimony was appropriate because the police officer's testimony was similar to that of an expert on "accident reconstruction" (filing no. 15-4 at CM/ECF pp. 7-8); (c) the evidence was sufficient to go to the jury, in general, the motion for a directed verdict was properly overruled and as to Count III, Yanga failed to specifically assign and specifically argue that an alleged lack of serious bodily injury regarding Count III required dismissal–again, in plain terms, that portion of the argument was defaulted (filing no. 15-4 at CM/ECF pp. 8-10); (d) the prosecution did not proceed on mutually inconsistent theories such that Count I-IV should have been dismissed (filing no. 15-4 at CM/ECF p. 10); (e) Yanga's complaints about overruling objections were too general–again, that claim was, in plain terms, defaulted under state law by the failure of appellate counsel to be more specific (filing no. 15-4 at CM/ECF p. 10); (f) since the sentences were within the statutory limits and Yanga had not discussed the factors that would warrant lower sentences the court declined to address the issue of excessiveness and affirmed the sentences–again, in plain terms, the argument was defaulted (filing no. 15-4 at CM/ECF p. 11.) Yanga's petition for further review was denied by the Nebraska Supreme Court on August 16, 2016. (Filing no. 15-3 at CM/ECF p. 3.)

5. On October 21, 2016, Yanga filed a pro se post-conviction action, alleging the same issues as were raised in his direct appeal. (Filing no. 15-14 at CM/ECF pp. 12-27.)

6. The district court denied an evidentiary hearing, and denied post-conviction relief on June 5, 2017. (Filing no. 15-14 at CM/ECF pp. 34-41.) In short, the court ruled (*id.* at CM/ECF p. 38) that:

> Here, the defendant's claims and assignments of error have previously been raised on appeal. He has not produced any evidence to establish that his counsel was defective or that he was prejudiced by his counsel's actions or inactions. Even if the defendant's claims were not procedurally barred, he has not asserted any sufficient factual allegations which constitute an infringement of his rights under the Nebraska or

United States Constitution. Because he is both procedurally barred, and his motions allege only conclusions of fact or law, he is entitled to no relief.

7. The state's motion for summary affirmance of the denial of post-conviction relief was granted by the Nebraska Court of Appeals on November 17, 2017. (Filing no. 15-12 at CM/ECF p. 2.) The court stated:

> Motion of appellee for summary affirmance sustained; judgment affirmed. See Neb. Ct. R. App. P. § 2-107(B) (2) . Appellant's claims were either procedurally barred, had already been raised and resolved on direct appeal, or his petition made insufficient allegations which constituted infringement of his constitutional rights. Also, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. See State v. Thompson, 278 Neb. 320 (2009); State v. Henry, 292 Neb. 834 (2016) .

(*Id*.)

8. Yanga filed a petition for further review, which was denied by the Nebraska Supreme Court on January 9, 2018. (Filing no. 15-12 at CM/ECF p. 2.)

9. Yanga filed his habeas petition on January 18, 2018. (Filing no. 1.)

### *Facts and Trial Background*

I next state the chilling facts of the offenses and the trial background as found by the Court of Appeals when ruling upon the direct appeal:

> Yanga was charged with two counts of attempted assault in the second degree, one count of use of a deadly weapon to commit a felony, one count of criminal mischief, over $1,500, and one count of assault in the third degree following events which took place at approximately 4:30 a.m. on September 21. Trial took place on March 2, 3, and 4, 2015.

5

Yanga and Mazaher Bakry had dated for almost three years, but the relationship ended in February 2014. Bakry testified that at approximately 9:30 p.m. on September 20, Bakry and her son went to a birthday party at Bakry's sister's home. Bakry's car was not available so she needed a ride to and from the party. Tombe Ladu attended the same party and when the party ended at about 4 a.m., he agreed to give Bakry, her son, and another woman a ride home. Ladu testified that he had noticed a blue car following him very closely on the drive from the party, so much so that the lights in the rear view mirror were blinding him. He testified that he knew Yanga as they were part of the South Sudanese community, and he had recognized the blue car belonged to Yanga.

The other woman was dropped off first, and when Ladu arrived in the parking lot of Bakry's apartment complex, Bakry saw Yanga's car leaving the complex. Ladu stopped in front of Bakry's apartment building door. Bakry saw Yanga make a U-turn and return toward the apartment parking lot. Yanga parked his car and approached the door of Ladu's car before Bakry was able to exit. Yanga called Bakry insulting names and told her that he was not going to leave her. Bakry exited the car and told Yanga he should leave her alone. Yanga attempted to slap Bakry with his hand and she threatened to call the police. Yanga kept talking to Bakry as she led her son into the apartment building.

Ladu was still in his car, and noticed that Bakry had left the car door open, so he exited the car to close the door, intending to leave. As Ladu was re-entering his car, Yanga returned and kicked him while also threatening him. Ladu told Yanga that he was going to call the police, but as he took his phone out of his pocket, Yanga slapped the phone out of his hand and crushed it on the ground. At that time, Bakry called the police and informed Yanga she was doing so. Yanga responded that he did not care, and continued to yell at Bakry. Yanga told Bakry "he was not a chicken" and that he would be back, then left in the same direction that he came from. Bakry was on the phone with the police at the time and informed the dispatcher that Yanga had just left. She was told to call back if Yanga returned.

As Ladu picked up his phone from where it had been damaged, Yanga was returning to the parking lot. Bakry testified that Yanga had been gone for approximately a minute and a half. At that time Bakry and Ladu were standing behind Ladu's car and Bakry shouted for Ladu to move. Ladu observed Yanga's car approaching at a high rate of speed and could hear the engine accelerating. Bakry reached out and literally pulled Ladu between two parked cars stating they just barely got out of the way of Yanga's car. Bakry heard Yanga's car collide into Ladu's car and several other parked cars. Ladu's car, a 2008 Chrysler 300 was hit with enough force that it moved from its parked position and the airbags were deployed inside of Yanga's vehicle.

Yanga struggled away from the inflated air bags and went after Bakry and Ladu, who both fled. Yanga caught up to Ladu and placed him in a "headlock" as they fell to the ground. Ladu, in response, was able to "pin" Yanga, although Yanga struggled, punching Ladu in the head. Ladu said he was crying because it hurt so much and his arms were weak. Meanwhile, Bakry called the police again and when they arrived, Yanga was placed under arrest.

Ladu testified that after this confrontation with Yanga his knees were bruised, he had pain in his left elbow and right arm, and pain in his head. Ladu testified that it cost him $287 to repair the damage Yanga caused to his phone. He also testified that his automobile insurance carrier valued the damage to his car at approximately $12,000. Ladu was reimbursed for about $11,500 of the damage, after a $500 deductible was subtracted.

Officer Tyler Nitz of the Lincoln Police Department was dispatched to Bakry's apartment complex at about 4:40 a.m. on September 21. He was on his way there when dispatch advised that one of the parties left in a blue Mazda and was likely headed for West A Street. He tried to locate the car, but was unsuccessful. Dispatch advised that the Mazda had returned and Nitz hurried back to the apartment complex. When he arrived, he observed that Officer Kevin Meyer was on top of Yanga and Yanga was taken into custody. Meyer told Nitz that Yanga was actively fighting Ladu when he arrived and Nitz observed that Yanga was yelling and aggressive. As Nitz escorted Yanga to his

cruiser, Yanga appeared very emotional and upset, but he cooperated in walking to the car. Nitz testified that Yanga was calling Bakry and Ladu names, was trying to slip out of the handcuffs, and was kicking at the cruiser door once he was seated inside.

Yanga volunteered that he was involved in the altercation and stated that he was defending himself. Yanga told Nitz that his head hurt, and Nitz observed that there had been a "pretty significant" car accident, so Nitz took Yanga to the hospital. At the hospital, Yanga was uncooperative and aggressive, and he was handcuffed to the bed. The wheels of the heavy, motorized bed were locked, but Yanga still drug it around the room. It was determined that Yanga was too aggressive to be tested, and he was mildly sedated. Yanga admitted to consuming alcohol earlier in the evening, and Nitz smelled of moderate odor of alcohol emanating from him.

Meyer testified that when he arrived at the apartment complex Bakry directed him to where Yanga and Ladu were fighting. He observed Ladu on top of Yanga, trying to keep Yanga from hitting him, and Meyer split the two men up. Meyer conducted an accident investigation after observing several damaged cars in the parking lot. He created a diagram to help explain his testimony, showing there were four separate points of impact on three parked cars, as well as Ladu's car. Ladu's car left several feet of skid marks after it was struck. Meyer observed that Ladu was upset, afraid, crying and shaking, and Ladu told him that he was in fear for his life at the time of the incident.

Paula Gottier, a resident of the apartment complex, testified that she was awakened by people yelling outside of her window at 4:30 a.m. on September 21. From her window, she observed three people standing by cars in the parking lot, then one person sped away in a blue Mazda. Soon after, she witnessed the Mazda returning to the parking lot traveling "quite a bit faster" than the speed normally driven in a parking lot. She saw that there were two people in the parking lot between the parked cars. She observed that the Mazda was angled toward the parked cars, not traveling in the direction that cars normally drive, and she saw it hit other cars in the lot. She did not see any brake lights or hear screeching of brakes prior to the impact.

Brian Sloan testified that his 2010 Chevrolet Silverado pickup truck was damaged on September 21. He testified that he paid about $1,100 to get the damage fixed.

Kyle Sawyer testified that his "brand new" 2013 Kia Rio had no damage on September 20. However when he woke on September 21, there was damage to the rear bumper, trunk, and driver's side rear quarter panel. He testified that it cost approximately $1,500 to get his car repaired. He was responsible for a $500 deductible while his automobile insurance company paid the rest.

Michael Peirce testified that on September 20 his 2001 Ford Mustang was in good condition, with no damage to the rear bumper or anywhere else. It was also damaged on September 21. At the time of trial he had yet to repair his vehicle.

After the State rested, Yanga moved for a directed verdict on all five counts. Yanga argued that with respect to the criminal mischief charge, the State had not shown that Yanga intentionally or maliciously intended to cause damage to anyone's property, and the State improperly aggregated the damages of the victims to reach a level of pecuniary loss totaling over $1,500. The district court overruled the motion.

During the jury instruction conference Yanga's counsel renewed the argument that it was improper for the State to aggregate and to list alternate victims in Count IV of the information. The court overruled the motion for directed verdict.

With respect to Count IV, the jury instructions included a provision that the State must prove beyond a reasonable doubt that "a. Emmanuel S. Yanga intentionally damaged property of Tombe Ladu, Brian Sloan, or Kyle Sawyer" and that he did so on or about September 21, 2014. Counsel did not specifically object to the portion of instruction IV which named multiple property damage victims in Count IV. Yanga objected to Count IV, Instruction IV, as counsel stated "it's our position it should not be instructed to the jury itself." Counsel also objected to the same instruction requesting that the jury should be instructed that criminal mischief may be either intentional or malicious. The State

9

indicated it wanted to proceed only on whether the crime was committed intentionally, and the court overruled Yanga's objection.

Yanga also objected to jury instruction number 11 with regard to whether Officer Meyer was an expert witness. The district court found it was a "close call" but thought the officer who prepared the diagram of the movement of the vehicles did something that not everyone else is able to do. The court stated that while Meyer may not be an expert in the "classical sense," he did have specialized training and thought the expert instruction was warranted.

The jury was instructed and shortly thereafter, the jury asked two questions. First, the jury asked whether it should add the sum of the damages of all the vehicles together, or treat them separately, and second, whether the measure of damages should be the out of pocket expenses or the total value of the damage to the vehicles. The district court proposed that the jury be told to calculate the damage resulting from Yanga's intentional act, and that pecuniary loss should be calculated based on the loss experienced by someone other than Yanga from damage to the property owned by Ladu, Sloan, or Sawyer. Yanga's counsel stated "Without waiving any of the objections or arguments I made before with respect to Count IV, I have no objections to the Court's answers to their questions."

Yanga was convicted on all five counts by the jury. On May 6, 2015, Yanga was sentenced. Yanga denied all responsibility for any of the crimes and asserted that Ladu was the guilty party. He was sentenced to 20 to 36 months' imprisonment for Counts I, II, and IV, each of which were Class IV felonies. Yanga was sentenced to 2 to 3 years' imprisonment for Count III, a Class II felony, and 180 days for Count V, a Class I misdemeanor. Counts I, II, III and IV were to be served consecutively and Counts IV and V were ordered to be served concurrent to one another and consecutive to any other sentence served by Yanga. Yanga was given credit for 225 days already served. Yanga now appeals his convictions and sentences.

(Filing no. 15-4 at CM/ECF pp. 1-4.)

*Overview of Applicable Law*

Three strands of federal habeas law intertwine to decide this case. They are the law of procedural default, the deference that is owed to the state courts, and the standard for evaluating a claim of ineffective assistance of counsel.

I briefly set out those principles now, so that I may apply them later in a summary fashion as I review the claims. I turn to that task next.

*Procedural Default*

As set forth in 28 U.S.C. § 2254:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B) (i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts *before* seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation marks omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### *Nebraska Law Relevant to Procedural Default*

Under Nebraska law, you don't get two bites of the post-conviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."); *State v. Filholm*, 848 N.W.2d 571, 576 (Neb. 2014) ("When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.").

On appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise, the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

### *Deference Under 28 U.S.C. § 2254(d)*

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A

state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.* However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

### *The Especially Deferential <u>Strickland</u> Standard*

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for petitioners to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

The Supreme Court has recently emphasized that *Strickland* applies equally to appellate counsel, and that appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under Antiterrorism and Effective Death Penalty Act (AEDPA); Petitioner could not establish that Petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt").

*Analysis*

This case is made more difficult because Yanga's claims are so vague (despite an opportunity to amend[3]) and one has to parse his factual allegations to try to get a handle on what he is actually claiming. Even then, it is difficult to put flesh on the bones of his claims. This, for example, makes it difficult to ascertain whether the claims presented here have been fairly presented to the Nebraska courts.

**Substantive Matters Decided on the Merits in State Court**

Assuming without deciding that his four claims somehow include the matters resolved on the merits by the Nebraska Court of Appeals–things like jury instructions regarding pecuniary loss, expert testimony from the cop, sufficiency of the evidence, mutually inconsistent prosecution theories and so forth–and assuming further those decisions implicate the Constitution, giving the state courts the deference that they are due, Petitioner is not entitled to relief. The Nebraska Court of Appeals' decision was closely reasoned on these issues, the Nebraska Supreme Court found nothing of concern to justify further review, and there is no basis for me to second guess them.

---

[3] I gave him an opportunity to amend, and advised him that: "The Amended Petition for Writ of Habeas Corpus (filing no. 10) is far too vague. The four claims asserted fail to state the specific facts in an understandable fashion." (Filing no. 12.) I stress that I do not believe Yanga is incapable of prosecuting this matter. For example, when Yanga was questioned by the trial judge about whether he wished to testify or remain silent, Yanga asked the judge a question about his right to appeal if he did not testify and the judge and Yanga engaged in a discussion. After that discussion, Yanga said "no thanks" to the judge about whether he wished to exercise his right to testify. Yanga was able to speak and understand English and able to engage in a relatively sophisticated dialogue with the judge about his rights. (Filing no. 15-8 at CM/ECF pp. 198-199.)

*Procedural Default*

I agree with Respondents that everything else has been procedurally defaulted and no excuse has been provided that would allow me to ignore those defaults. I do, however, need to elaborate briefly.

First, since Petitioner had separate counsel on appeal under Nebraska law he was required to attack trial counsel in the direct appeal or forfeit that claim. Petitioner did not attack trial counsel, although he had separate appellate counsel. Additionally, I note that some arguments were defaulted on appeal for failure to follow Nebraska appellate procedure (for example, complaints on appeal about overruling objections were too generally presented by appellate counsel and therefore defaulted). So, the question arises whether appellate counsel's "failures" can serve as an excuse. The answer is they cannot.

Yanga had the opportunity in the post-conviction matter to address any error by appellate counsel–either for failing to attack trial counsel or for failing to abide by Nebraska appellate procedure–but he failed to do so. Indeed, the post-conviction judge stated simply, but correctly, that: "He has not produced any evidence to establish that his counsel was defective or that he was prejudiced by his counsel's actions or inactions." (Filing no. 15-14 at CM/ECF p. 38.) To the extent he made any mention of counsel (trial or appellate), the reference was conclusory.

Secondly, even if it could be argued that errors by separate direct appeal counsel constituted "cause" to excuse the procedural defaults (notwithstanding the adverse post-conviction ruling), Petitioner would still have to show "prejudice" when applying the cause and prejudice standard.

Regarding errors by trial counsel, "[t]o demonstrate procedural bar prejudice, [Petitioner] 'must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and

substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Armstrong v. Kemna*, 590 F.3d 592, 606 (8th Cir. 2010) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

The same would be true under a straightforward application of the "prejudice prong" of the *Strickland* standard to the actions of appellate counsel. Yanga could "only prevail on appeal if he convinces us there is a reasonable probability that, but for his appellate counsel's failure . . . , he would have prevailed before the" state appellate courts. *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005).

Before the state post-conviction courts, Yanga made no effort to show that trial counsel's actions prejudiced him. Before the state post-conviction courts, Yanga made no proper effort[4] to show that appellate counsel's actions prejudiced him. Therefore, he has not satisfied the cause and prejudice standard.

Third, there is no reason to believe Petitioner is actually (meaning factually) innocent or that some miscarriage of justice took place. I have carefully examined the record. The evidence was sufficient to convict the Petitioner beyond a reasonable doubt. For example, not only did the victims testify that Yanga tried to run them over with his car, but unrelated witnesses and the physical evidence corroborated their testimony.

---

[4] In a typewritten pro se appellate brief regarding the post-conviction denial Yanga did raise an argument about ineffective assistance of appellate counsel. (Filing no. 15-10 at CM/ECF pp. 2, 7, 11.) It was conclusory, convoluted and too late. The Court of Appeals summarily decided (among other things) that "his *petition* made insufficient allegations" regarding "infringement of his constitutional rights." (Filing no. 15-12 at CM/ECF p. 2.) (Italics added.) In other words, he had not given the state post-conviction district judge an opportunity to rule upon anything other than conclusions. Frankly, the same thing is true for that post-conviction appellate brief.

## *No Certificate of Appealability*

Lastly, a petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). I have applied the appropriate standard and determined that Petitioner is not entitled to a certificate of appealability.

IT IS ORDERED that the habeas corpus petition (filing no. 13) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

DATED this 16th day of July, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge